# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBORAH M. VEREEN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | CV-06-462 |
| | ) | |
| WOODLAND HILLS SCHOOL | ) | |
| DISTRICT, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

**Conti, District Judge**.

### *Introduction*

Pending before the court is a motion for summary judgment filed by defendant Woodland Hills School District ("defendant" or "School District") seeking judgment in defendant's favor with respect to all claims asserted by plaintiff. (Docket No. 33.) Plaintiff filed an amended complaint asserting four counts: 1) count I, claims for sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, as amended, 43 PA. CONS. STAT. ANN. § 951 *et seq.* (the "PHRA"); 2) count II, claims for race discrimination under Title VII, the PHRA and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981"); 3) count III, claims for unequal pay under the Equal Pay Act, as amended, 29 U.S.C. § 206(d) (the "Equal Pay Act"); and 4) count IV, retaliation claims under Title VII, the PHRA, § 1981 and the Equal Pay Act. For the reasons described below, defendant's motion will be denied with respect to plaintiff's Equal Pay Act claim and will be granted in all other respects.

## *Background*

### Plaintiff's Employment

Plaintiff, an African-American female, has a masters degree in secondary education and a doctorate degree in education. Joint Concise Statement of Material Facts ("J.C.S." (Docket No. 60) ¶ 67.) Since 1992, she has served in various administrative positions in different school districts. (*Id.* ¶ 67.) On August 19, 1996, Vereen was hired by the School District as an assistant principal for East Junior High School for the 1996/1997 school year. (*Id.* ¶ 1.) She entered into, and agreed to, a contract which set her annual salary at $60,500.00. (*Id.* ¶ 2.) The School District hired three other administrators during the same year. (*Id.* ¶¶ 3-5.) They were Mary Frances Duncan ("Duncan"), John Folmar ("Folmar") and Craig Jackson ("Jackson"). (*Id.* ¶ 5.) Duncan was a substitute principal for Rankin Intermediate School, while Folmar and Jackson were both assistant principals for Woodland Hills High School. (*Id.*) Vereen, Duncan, Folmar and Jackson were all contracted to work at the same annual salary of $60,500.00. (*Id.* ¶ 4.)

Vereen was appointed as the acting principal of East Junior High School on February 10, 1999, with an additional per diem rate of $55.77. (*Id.* ¶ 6.) Vereen filled in for Richard Fischer ("Fischer") who had been earning $78,579 and she served in this acting capacity for approximately six weeks. (*Id.* ¶ 7.) Vereen returned to her prior duties, working for her original salary of $60,500.00. (*Id.*) On October 13, 1999, Vereen was appointed as the principal of East Junior High School at a salary of $60,500.00. (*Id.* ¶ 8.) This salary arrangement was apparently subject to the approval of a new "Act 93 agreement." (*Id.*) The Act 93 agreement was an agreement between the Woodland Hills Administrators Association and the School District setting supervisory compensation program and fringe benefits for all members of the School

District's administrative staff between July 1, 1999, and June 30, 2004.[1] (*Id.* ¶ 11.) Vereen contends that she had received verbal assurances of an opportunity to negotiate her salary, based on her experience, after the approval of the Act 93 agreement. (Vereen Aff. (Docket No. 42-2) at 2.) The Act 93 agreement was approved by the School District's Board of School Directors ("Board") on November 10, 1999. (J.C.S. ¶ 9.) Vereen testified that she participated in meetings necessary to conclude the new Act 93 contract. (Vereen Dep. at 17 (Docket No. 44-2 at 5).) Vereen's annual salary was increased to $69,045.12 as a result of that approval. (*Id.* ¶ 10.) This salary was consistent with her placement on level 2, step 1, of the Act 93 agreement's pay scale. (App. Def's Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Tab F (Docket No. 36 at 56), Tab J (Docket No. 36-2 at 12).)

Vereen, while she was on a two-week vacation, was transferred by the School District in 2001 to be the principal at Fairless Intermediate School. Dr. Herbert Morgan ("Morgan') was hired without an interview on April 6, 2001, to take Vereen's position as the principal at East Junior High School with a starting salary of $74,631.00. (Vereen. Aff. (Docket No. 42-2) at 6; Supplemental App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Tab 5 (Docket No. 57 at 42, ¶ 5).) Morgan had received higher salaries at other school districts. (Def's Supplemental App., Tab 5 at 42.)

On August 6, 2001, Dr. Gary Thomas ("Thomas") was hired as the principal at West Junior High School at an annual salary of $80,441.00. (Supplemental App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Tab 5 (Docket No. 57 at 42) ¶ 6.)

---

[1]Pennsylvania law provides a framework for school administrators to negotiate compensation plans with school employers. 24 PA. STAT. ANN.. § 11-1164. The "Act 93 agreement" referenced in this memorandum opinion was an agreement formed pursuant to this framework.

Thomas was apparently the principal of Dickson Intermediate School as of May 22, 2007 (the date of Vereen's affidavit). (Vereen Aff. (Docket No. 42-2) at 6-7.) Vereen states that while her position at Fairless Intermediate School is equivalent to Thomas' position at Dickson Intermediate School in terms of job duties and expectations, her annual salary is presently about $10,000.00 less than that of Thomas. (*Id.*)[2]

Candice Bostick ("Bostick"), an African-American woman, testified that she was paid less than a white male who performed the same duties as her. (Bostick Dep. at 14-17 (Docket No. 44-7) at 5.) With respect to the Act 93 agreement itself, Bostick testified that the School District had considerable discretion as to where on the pay scale a particular employee would be placed. (Bostick Dep. at 16 (Docket No. 44-7 at 5).) Superintendent Robert Grimm ("Grimm") had made adjustments to the salaries of some assistant principals serving at Woodland Hills High School on the ground that these individuals were expected to attend athletic events during evening hours. (Supplemental App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Tab 5 (Docket No. 57 at 47-48, ¶¶ 15-16).) Superintendent Roslynne Wilson ("Wilson"), an African-American woman, may have told Vereen that the School District had "the *prerogative* to place an administrator at any level" on the Act 93 pay scale. (App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume II, Tab K (Docket No. 36-2 at 14), (Docket No. 36-6 at 11, ¶ 3) (emphasis in original).)

---

[2]In her responsive affidavit, Wilson did not address the present pay differential between Vereen and Thomas.

**Plaintiff's Salary Concerns**

On March 27, 2001, Vereen sent a letter to Superintendent Stanley Herman ("Herman") about her placement on the Act 93 salary scale. ( *Id.* Tab G (Docket No. 36-2 at 6, ¶ 12).) This letter constituted a petition to the Board for a salary adjustment. (*Id.* ¶ 13.) Two days later, on March 29, 2001, Herman sent Vereen a memorandum explaining that Vereen's placement on the salary scale had been correct. (*Id.* ¶ 14.) On September 30, 2004, Vereen sent a detailed memorandum to Wilson, who had apparently replaced Grimm as the superintendent. That memorandum stated, in pertinent part, as follows:

> . . . Unfairness was initially exemplified by the school district when I earned more money as Acting Principal at Woodland Hills East Junior High School for six weeks during the 1998-1999 school year that I did when I began my tenure at the same building as Principal the following school year. My placement on the salary scale as a first year Principal, despite serving three years as Assistant Principal at East, was *discriminatory*. . . .
>
> In my preliminary conversation with you on September 22, 2004 about my salary complaint, you indicated that, while a salary scale may exist within a school district, that organization has the *prerogative* to place an administrator at any level. It must be noted that neither Dr. Herman nor Dr. Grimm indicated that to me when I extensively discussed my issue with them. . . .
>
> Due to the serious nature of my salary complaint, I am requesting that the Woodland Hills School District work to resolve this issue. From my perspective, being placed on level four of the previous principal's salary scale at the onset of my tenure as Principal which would have given credit for my three year service as Assistant Principal and would have been comparable to the amount I received as Acting Principal is the resolution that I seek coupled with monetary retroactivity.

(*Id.*, Tab K (Docket No. 36-2 at 14-15)(emphasis in original).) In Herman's letter, he responded to Vereen's complaints by suggesting that she "test the market in other school districts." (App.

to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume II, Tab H (Docket No. 36-2 at 7).)

Herman was succeeded as superintendent by Grimm. In a memorandum dated April 22, 2002, Vereen expressed concerns about her salary to Grimm. (*Id.* ¶ 15.) On September 6, 2002, Grimm sent Vereen a letter stating that her salary was appropriate, and that no adjustment was warranted. (*Id.* ¶ 16.) In a memorandum dated September 30, 2004, Vereen expressed her dissatisfaction with her salary to Wilson, who was apparently Grimm's successor. (*Id.* ¶¶ 18-19.) Wilson responded in a letter to Vereen dated January 25, 2005, stating that Vereen's salary was appropriate. (*Id.* ¶ 20.)

Wilson referred Vereen's complaint to the School District's solicitor, who apparently corresponded with Wilson about the matter. In a letter to Vereen dated January 25, 2005, Wilson stated that persons "acting" (i.e., acting as the principal without actually *being* the principal) were "normally provided with a daily stipend to acknowledge the additional duties undertaken." (*Id.*, Tab L (Docket No. 36-2 at 17).) She noted that Vereen's complaint rested on the "false premise" that the pay which Vereen received while acting as the principal of East Junior High School was "the floor from which all other salaries should have been based." (*Id.*) Wilson stated that she believed that Vereen had been properly placed on the salary scale, and that she agreed with the logic expressed in Grimm's prior correspondence. (*Id.*)

## Assistant Superintendent Position

The position of assistant superintendent became open on March 1, 2005. (*Id.* ¶ 21.) The position was advertised by the School District on its website, the Pennsylvania School Board Association, the *Pittsburgh Post-Gazette*, the *New Pittsburgh Courier*, and PA-Educator.net. (*Id.* ¶ 22.) According to the postings, the qualifications included:

1. Pennsylvania letter of Eligibility
2. Successful experience in school administration.
3. Experience with Special Education
4. Extensive experience in curriculum development.
5. Experience in K-12 staff development.
6. Experience in school reform efforts.

(App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ J., Volume II, Tab M (Docket No. 36-2 at 20-21).) Thirty-six applicants sought the position, eight of whom, including five women, were selected for interviews. (*Id.* ¶ 23; App. to Def's Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume II, Tab N (Docket No. 36-2 at 28-29).) Only seven applicants were actually interviewed, since one person, a male, did not show up. (*Id.* ¶ 24.) Four of these seven individuals, including Vereen and James Palmiero ("Palmiero"), were selected for a second round of interviews. (*Id.* ¶¶ 25, 26.)

The interviews were conducted by Wilson and Renee Yeager ("Yeager"), a personnel supervisor. (*Id.* ¶ 27.) All applicants were asked the same questions. (*Id.* ¶ 28.) Palmiero received the highest interview scores among the applicants. (*Id.* ¶ 29.) During the first round of interviews, Palmiero received an overall score of 800, with a writing score of 160. (*Id.* ¶ 30.) Vereen's scores were the lowest. (Wilson Aff., App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume VI, Tab S (Docket No. 36-6 at 12, ¶ 17).) Vereen

received an overall score of 650, with a writing score of 140. (*Id.* ¶ 31.) During the second round of interviews, Palmiero again received the highest score, which was 280. (*Id.* ¶ 32.) He was the only candidate with a both a reading specialist certification and a curriculum and instruction certification. (*Id.* ¶ 35.) He had central office experience and a background in integrating technology into the classroom. (*Id.* ¶ 36.) Palermo was ultimately chosen for the position. Wilson stated that Palmiero was chosen for the position because of his background in reading, his interview scores, his central office experience, and his ability to integrate technology into the curriculum. (Wilson Aff., App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume VI, Tab S (Docket No. 36-6 at 12-13, ¶¶ 18, 20).)

### March 2006 Incident

Vereen spoke with Wilson about an incident in March 2006 in which one fourth-grade student allegedly took pencils from another student. (*Id.* ¶¶ 40-41.) The student allegedly took pencils away from another student at the end of a school day. (Vereen Aff. (Docket No. 42-2) at 3.) According to Vereen, she asked the student if he had taken another student's pencils, but he would not admit to doing so. (J.C.S. ¶¶ 42-43.) When Vereen asked the student for the pencils, he refused to hand them over. Vereen proceeded to take the student into another classroom, in the presence of a teacher acting as a witness. Vereen noticed that the student, who was sitting at a table, had a "metal disk" under his hand. Fearing that the disk could be used as a weapon, Vereen took the disk away from the student, causing him to become angry. Vereen extended her arm on a wall near the doorway to the classroom, apparently for the purpose of communicating to the student that he was not free to leave. (Vereen Aff. (Docket No. 42-2 at 4).) The student, who

allegedly weighed between 160 and 170 pounds, wrestled Vereen's arm off of the wall, causing her to aggravate a pre-existing back condition.  (*Id.*)

As a result of this incident, the student received an initial out-of-school suspension lasting for a period of three days.  (*Id.*)  After an informal hearing was held, this suspension was extended by seven days, making the total period of suspension last for ten days.  (*Id.*)  Vereen wanted to take the student before the Board for a formal expulsion hearing, so she prepared the documentation needed to do so.  (*Id.*)  When Wilson and Palmiero arrived at the school to discuss the incident with Vereen, they informed her that they did not view the incident as an "assault," and that they did not believe that further disciplinary action was warranted.  (*Id.* at 4-5.)  Wilson stated that she did not recommend further disciplinary action (i.e., disciplinary action beyond the ten-day suspension which had already been imposed on the student) because the student had not been a disciplinary problem in the past, and because the incident itself had not been sufficiently serious to warrant a more aggressive disciplinary response.  (App. to Def.'s Concise Statement of Material Facts, Volume VI, Tab S (Docket No. 36-6 at 13-14, ¶¶ 31-34).)  According to Wilson, Vereen's actions escalated the confrontation with the student.  (*Id.* (Docket No. 36-6 at 13, ¶ 30).)

Believing that she had been assaulted, Vereen sought Wilson's permission to file disorderly conduct charges against the student with the local magistrate.  (J.C.S. ¶ 107.)  Vereen contacted the North Braddock Police Department about the incident.  (Vereen Dep. at 75 (Docket No. 44-2 at 20).)  Police officers told her that they did not wish to pursue the matter, since the student was only nine-years-old.  (*Id.*)  Two weeks after the altercation, Vereen sought medical treatment for a pre-existing back condition.  *Id.* at 76 (Docket No. 44-2 at 20).  Medical

personnel informed her that she was suffering from a pinched nerve.  (*Id.*)  She later sought treatment from a chiropractor.  (*Id.* at 77 (Docket No. 44-2 at 20).)

Vereen testified that other students had been taken before the Board for expulsion hearings.  (*Id.* at 94 (Docket No. 44-2 at 25).)  In one instance, a student assaulted some staff members (including Vereen), causing them to be rushed to the emergency room.   (*Id.* at 95.)  In another instance, a student was subjected to an expulsion hearing for exposing himself to, and sexually harassing or "assaulting," a female student.  (*Id.*)  Vereen believed that the fourth-grade student who "wrestled" her arm off of the wall, or "pushed his way out of the room," should have been subjected to an expulsion hearing as well.

Vereen testified as follows concerning the School District's alleged retaliatory motive for not imposing harsher discipline on the fourth-grade student:

> Q.    Why do you think that because you filed a Complaint that this was
>         criticism with regard to that?  That they refused to have an expulsion
>         hearing?  How are those two linked together?
>
> A.    It's my belief that Dr. Wilson initially was supportive of me.  She told me
>         to let her know what I wanted to do.  To me that was an indicator that she
>         was supportive of what I felt needed to happen to the student.  But it's also
>         my belief that after she may have spoken to whether it's a Board member,
>         Board members, it's just my belief that there was some discussion that I
>         should not–that the case should not be taken.
>
> Q.    Was that discussion linked to the fact that you had filed a Complaint?
>
> A.    It's my belief it is.  It is my belief that it is.

(*Id.* at 96. )

### Performance Evaluations

Vereen received a performance evaluation for the 2005/2006 school year.  (*Id.* ¶ 56.)  For purposes of the School District's performance evaluations, ratings of "A" through "C" were deemed to be satisfactory, while ratings of "D" through "F" were deemed to be unsatisfactory.  (*Id.* ¶ 58.)  Out of eight different categories, Vereen received four "A" ratings and four "B" ratings.  (*Id.* ¶ 57.)  Wilson informed Vereen that the four "B" ratings had been given because of Vereen's failure to work on Saturdays to interview teaching candidates, her failure to attend Saturday school for students, and her failure to attend community events (such as Martin Luther King, Jr., Day festivities at a local church).  (*Id.* ¶ 60.)  Those kind of functions were expected to be attended by all principals.  (*Id.* ¶ 61.)  The School District apparently provides students with Saturday school in lieu of suspension.  (*Id.* ¶ 62.)  Vereen stated that she had always worked on Saturdays when expected to do so.  (Vereen Aff. (Docket No. 42-2) at 5.)  She further stated that she had been unavailable to conduct interviews on Saturdays precisely *because* of her Saturday school responsibilities.  (*Id.* at 3.)  Upset with the ratings, Vereen refused to sign the performance evaluation and sent a detailed rebuttal to Wilson.  (*Id.* ¶ 113.)

### Procedural History

On August 17, 2005, Vereen completed an EEOC questionnaire.  (Docket No. 17-2.)  On December 4, 2005, Vereen filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5, alleging that both the terms of her compensation and the School District's failure to hire her for the assistant superintendent position had been in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.,* ("Title VII").  (Docket No. 14-2 at 2-3.)  The EEOC dismissed the

charge on February 28, 2006, placing partial reliance on the alleged untimeliness of Vereen's claims related to her wages. (Docket No. 14-3.) Having received notice of her right to sue, Vereen commenced this action on April 7, 2006, alleging violations of Title VII, the PHRA and the Equal Pay Act. On April 28, 2006, the School District filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Vereen responded by filing an amended complaint on May 16, 2006. In addition to claims under Title VII, the PHRA, and the Equal Pay Act, the amended complaint asserted claims under § 1981. On June 4, 2006, the School District filed a second motion to dismiss.

A hearing was held before the court on July 20, 2006. Vereen stipulated to the dismissal of her sex retaliation claim, which she had not exhausted. The court dismissed that claim without prejudice. The School District's motion to dismiss was denied without prejudice in all other respects, since the court determined that the remaining issues would be more appropriately dealt with within the context of a motion for summary judgment. The School District filed an answer to the amended complaint on August 9, 2006. On March 23, 2007, the School District filed the instant motion seeking summary judgment in its favor with respect to all claims asserted by Vereen.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A motion for summary judgment will not be defeated by the mere

existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249.

### *Discussion*

The amended complaint contains four counts. In count I, Vereen alleges that the School District violated Title VII and the PHRA by discriminating against her on the basis of sex. She bases these claims on the School District's alleged failure to provide her with compensation equal to that of her male counterparts and its decision not to hire her for the assistant superintendent position. Count II avers that the School District's failure to hire Vereen for the assistant superintendent position constituted violations of Title VII, the PHRA and § 1981, all of which prohibit discrimination on the basis of race. In count III, Vereen asserts a claim under the EPA, alleging that her pay was not equivalent to that of men performing substantially similar work. Count IV asserts claims for retaliation under Title VII, the PHRA, the Equal Pay Act and § 1981. Vereen alleges that she suffered retaliation after engaging in activity protected under these statutes. Her retaliation claims are based upon the School District's failure to hire her for the assistant superintendent position, its giving to her of lower marks on her performance evaluation, and its failure to impose harsher discipline on the student who allegedly assaulted her. The School District moves for summary judgment with respect to all claims contained in the amended complaint. The court will address each of these claims seriatim.

## A.  The Timeliness of Vereen's Salary-based Claims Under Title VII, the PHRA and § 1981

The substantive prohibition contained in Title VII provides:

**§ 2000e-2.  Unlawful employment practices**

**(a) Employer practices.**  It shall be an unlawful employment practice for an employer--
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).[3]  Because Pennsylvania is a "deferral" state (i.e., a state which has an agency authorized to investigate employment discrimination charges violative of a state law akin to Title VII in substantive application), Vereen had 300 days from the date of the alleged unlawful employment practice" to file her EEOC charge pursuant to 42 U.S.C. § 2000e-5.  *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 383 (3d Cir. 2007).  In order to determine whether Vereen's EEOC charge was timely, the court must precisely identify the relevant unlawful employment practice, and the date on which it occurred.

In *National Railroad Corporation v. Morgan*, 536 U.S. 101, 114 (2002), the United States Supreme Court construed the enforcement provisions of Title VII to require the timely

---

[3]The School District does not appear to dispute that it is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . ." 42 U.S.C. § 2000e(b).  Therefore, the court assumes that the School District is an employer for purposes of Title VII.

exhaustion of each "discrete act" constituting an "unlawful employment practice." The Supreme Court explained:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [The plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

*Morgan*, 536 U.S. at 114. The Supreme Court distinguished "discrete acts" of unlawful discrimination, which are individually actionable, from "hostile work environment" claims, which are based on the cumulative effect of several acts that are not themselves independently actionable. *Id.* at 115. Since a "hostile work environment" is itself an "unlawful employment practice," the Court held that "the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability" even if "some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117.

In *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit made clear that the distinction recognized in *Morgan* between "discrete acts" and "continuing violations" is "a generic feature of federal employment law" rather than simply "an artifact of Title VII." The court of appeals explained:

> The principles at work in *Morgan* apply with equal force to § 1983 claims. *Morgan* held simply that causes of action that can be brought individually expire with the applicable limitations period. By contrast, the "hostile work environment" theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant. In such cases, obviously the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement. *Morgan*, 536 U.S. at 117-18. The Court did nothing more than to restate, in the employment discrimination context, the common-sense proposition that an applicable statute of limitations begins to run at

15

the time the claim accrues, and that time-barred claims cannot be resurrected by being aggregated and labeled continuing violations.

*O'Connor*, 440 F.3d at 128-29.

The PHRA makes it unlawful:

> [f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required.

43 Pa. Stat. Ann. § 955(a). As a general rule, the Pennsylvania courts construe the relevant provisions of the PHRA in accordance with their federal counterparts. *Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996); *Stultz v. Reese Brothers, Inc.*, 835 A.2d 754, 759 (Pa.Super.Ct. 2003). The PHRA should be interpreted "as identical to federal anti-discrimination laws except where there is something specifically different in its language" justifying a different construction. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). Neither party argues that the *Morgan* framework is inapplicable for the purpose of determining when the actionable violation (or violations) of the PHRA occurred. Thus, the court will determine the time of the alleged PHRA violation (or violations) in accordance with the Supreme Court's analysis in *Morgan*. *Johnson v. The McGraw-Hill Companies*, 451 F.Supp.2d 681, 691-92 (W.D.Pa. 2006).

The statute of limitations issue with respect to Vereen's § 1981 claims is complicated by the presence of two different limitations periods for the kinds of claims contemplated under that statutory provision. The relevant statutory language provides:

### § 1981.  Equal rights under the law

**(a) Statement of equal rights.**  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined.**  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment.**  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.  Subsections (b) and (c) were added by Congress as a part of the Civil Rights Act of 1991, which was signed into law by President George H.W. Bush on November 21, 1991. Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1072 (1991).  These subsections were added by Congress to overrule *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989), in which the Supreme Court held that § 1981 did not proscribe discriminatory conduct occurring after the formation of a contract (such as racial harassment) and having no impact on one's ability to enforce established contractual obligations.  By expanding the definition of the phrase "make and enforce contracts," Congress "enlarged the category of conduct that is subject to § 1981 liability." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 303 (1994).

Like many federal claims, § 1981 does not contain its own statute of limitations. Consistent with longstanding federal practice, as codified by Congress via 42 U.S.C. § 1988, "the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."  *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985).  In

*Goodman v. Lukens*, 482 U.S. 656, 660-64 (1987), the Supreme Court characterized § 1981 actions as personal injury actions for statute of limitations purposes.  In Pennsylvania, the applicable limitations period for personal injury actions is two years.  42 PA. CON. STAT. § 5524(2), (7).[4]

To alleviate concerns regarding which statute of limitations would be applicable to various federal claims, Congress enacted a four-year statute of limitations as a default for federal claims lacking their own specific statutes of limitations.  Pub. L. No. 101-650, § 313, 104 Stat. 5089, 5114-5115 (1990).  This catch-all statute of limitations is codified at 28 U.S.C. § 1658(a).  The catch-all provision, however, applies only to civil actions "arising under an Act of Congress enacted after" December 1, 1990.  28 U.S.C. § 1658(a).  In *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004), the Supreme Court held that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990–and therefore is governed by § 1658's four-year statute of limitations–if the plaintiff's claim against the defendant was made possible by a post-1990 enactment."  In so holding, the Supreme Court rejected the argument that only a claim based upon "a new, stand-alone statute" was governed by section 1658.  *Jones*, 541 U.S. at 381.

While the parties in this case extensively briefed this issue, it is apparent that they disagree about what statute of limitations governs Vereen's § 1981 claims.  The School District believes that § 1981 claims are subject to Pennsylvania's two-year statute of limitations, while Vereen believes that they are subject to the four-year limitations period established by Congress.

---

[4]Subsection 2 establishes a two-year statute of limitations for actions "to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another."  42 PA. CON. STAT. § 5524(2).  Subsection 7 likewise establishes a two-year statute of limitations for other actions or proceedings "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct . . ."  42 PA. CON. STAT. § 5524(7).

In light of *Jones*, it is clear that claims which would have been actionable under § 1981 prior to the enactment of the Civil Rights Act of 1991 are governed by Pennsylvania's two-year statute of limitations, while claims which are actionable only because of the 1990 amendment to § 1981 are governed by section 1658(a)'s four-year statute of limitations. *Jones*, 541 U.S. at 383 ("Because petitioners' hostile work environment, wrongful termination, and failure to transfer claims did not allege a violation of the pre-1990 version of § 1981 but did allege violations of the amended statute, those claims 'ar[ose] under' the amendment to § 1981 contained in the 1991 Act."). The court cannot view § 1981 as an "undifferentiated whole" for statute of limitations purposes. *Chedwick v. Univ. of Pittsburgh Med. Ctr.*, 07-cv-806, 2007 U.S. Dist. LEXIS 91181, at *28 (W.D.Pa. Dec. 12, 2007). The court will evaluate the statute of limitations issues related to Vereen's § 1981 claims with these principles in mind.

The United States Court of Appeals for the Third Circuit has held that the elements of an employment discrimination claim brought under § 1981 are identical to those of a claim brought under Title VII. *Schurr v. Resorts International Hotel, Inc.*, 196 F.3d 486, 498-99 (3d Cir. 1999). For this reason, any substantive analysis of race discrimination under Title VII will also be dispositive of Vereen's parallel § 1981 claims. *Dietz v. Baker*, 523 F.Supp.2d 407, 423 n.23 (D.Del. 2007). Of course, the identical nature of the substantive elements of these distinct claims does not negate the effects that different statutes of limitations may have on the vitality of different claims contained in the amended complaint.

The School District contends that Vereen's claims under Title VII, the PHRA and § 1981 for salary-based discrimination must be dismissed they are time-barred. It is undisputed that Vereen contracted with the School District on August 19, 1996, to work for an annual salary of

$60,500.00. On February 10, 1999, she was appointed as the acting principal of East Junior High School with an additional per diem pay of $55.77. She remained in that position for approximately six weeks. At the conclusion of that period, she returned to her previous annual salary. Later that year, on October 13, 1999, she was appointed as the principal of East Junior High School. She retained her annual salary of $60,500.00, pending the approval of a new Act 93 agreement. On November 10, 1999, the Board approved the new Act 93 agreement. As a result, Vereen's annual salary was increased to $69,045.12. This salary was consistent with her placement on level 2, step 1, of the Act 93 agreement's pay scale. Vereen did not complete an EEOC questionnaire until August 7, 2005. Her formal EEOC charge was not filed until December 4, 2005.

For purposes of this case, the court assumes *arguendo* that the 300-day charging period should be calculated by reference to August 7, 2005, rather than December 4, 2005. *Ledbetter v. Goodyear Tire & Rubber Company, Inc.*, 127 S.Ct. 2162, 2166 n.1 (2007)("We likewise assume for the sake of argument that the filing of the questionnaire, rather than the formal charge, is the appropriate date."). Vereen's primary concern about her salary appears to stem from the fact that she made less as the principal of East Junior High School than she had made during the six weeks in which she acted in that capacity. In her deposition, Vereen testified that, during her six-week tenure as the acting principal between February and March 1999, she was making the rough equivalent of an annual salary of between $72,000.00 and $74,000.00. When she returned to her prior capacity, she no longer received the $55.77 per diem pay. Hence, she was returned to her prior annual salary of $60,500.00. She explained that, when she became the principal of East Junior High School in October 1999, her salary remained the same because of a salary freeze.

Shortly thereafter, Vereen's annual salary was increased to $69,045.12 as a result of the new Act 93 agreement. Nevertheless, Vereen testified that Herman had assured her that, after the approval of the new agreement, she would be given an opportunity to "negotiate a fair salary." Vereen Dep. at 41 (Docket No. 44-2 at 11). She apparently never received that opportunity.

Vereen's frustration with her salary is reflected in her correspondence to Herman, Grimm and Wilson. In a letter to Herman dated March 27, 2001, Vereen complained that she made more as the acting principal of East Junior High School than she made after being appointed as the principal seven months later. Herman responded two days later with a memorandum explaining that Vereen's salary was not on par with salaries of other principals because Vereen had been given a principalship earlier in her career than her counterparts had, and that her overall administrative experience had not been equal to theirs. In a memorandum to Grimm dated April 22, 2002, Vereen complained again that her post-appointment salary did not equal the pay that she had received while serving as the acting principal (which included both her salary and the $55.77 per diem pay). Grimm responded on September 6, 2002, by informing Vereen that her placement on the Act 93 salary schedule was appropriate.

On September 30, 2004, Vereen sent a detailed memorandum to Wilson, who had apparently replaced Grimm as the superintendent. That memorandum stated, in pertinent part, as follows:

> . . . Unfairness was initially exemplified by the school district when I earned more money as Acting Principal at Woodland Hills East Junior High School for six weeks during the 1998-1999 school year that I did when I began my tenure at the same building as Principal the following school year. My placement on the salary scale as a first year Principal, despite serving three years as Assistant Principal at East, was *discriminatory*. . . .

In my preliminary conversation with you on September 22, 2004 about my salary complaint, you indicated that, while a salary scale may exist within a school district, that organization has the *prerogative* to place an administrator at any level. It must be noted that neither Dr. Herman nor Dr. Grimm indicated that to me when I extensively discussed my issue with them. . . .

Due to the serious nature of my salary complaint, I am requesting that the Woodland Hills School District work to resolve this issue. From my perspective, being placed on level four of the previous principal's salary scale at the onset of my tenure as Principal which would have given credit for my three year service as Assistant Principal and would have been comparable to the amount I received as Acting Principal is the resolution that I seek coupled with monetary retroactivity.

(*Id.*, Tab K (Docket No. 36-2 at 14-15)(emphasis in original).) Wilson referred Vereen's complaint to the School District's solicitor, who apparently corresponded with Wilson about the matter. In a letter to Vereen dated January 25, 2005, Wilson stated that persons "acting" (i.e., acting as the principal without actually *being* the principal) were "normally provided with a daily stipend to acknowledge the additional duties undertaken." *Id.*, Tab L (Docket No. 36-2 at 17). She noted that Vereen's complaint rested on the "false premise" that the pay which Vereen received while acting as the principal of East Junior High School was "the floor from which all other salaries should have been based." *Id.* Wilson stated that she believed that Vereen had been properly placed on the salary scale, and that she agreed with the logic expressed in Grimm's prior correspondence. *Id.*

The relevant Act 93 agreement was approved on November 10, 1999. This event triggered Vereen's placement on the salary scale at level 2, step 1, thereby entitling her to an annual salary of $69,045.12. The School District argues that Vereen's salary-based Title VII claims are time-barred, since well over 300 days elapsed between November 10, 1999 (the date of Vereen's entitlement to the $69,045.12 annual salary), and August 7, 2005 (the date Vereen

completed the EEOC questionnaire).  In an attempt to refute the School District's argument,

Vereen calls the court's attention to the Supreme Court's decision in *Bazemore v. Friday*, 478

U.S. 385 (1986).  In *Bazemore*, the Supreme Court declared that "[e]ach week's paycheck that

delivers less to a black than to a similarly situated white is a wrong actionable under Title VII,

regardless of the fact that this pattern was begun prior to the effective date of Title VII."

*Bazemore*, 478 U.S. at 395-96 (Brennan, J., concurring in part).  Vereen relies on *Bazemore* for

the proposition that her receipt of paychecks during the charging period, which still reflected her

allegedly wrongful placement on the salary scale in November 1999, somehow preserved her

salary-based Title VII and PHRA claims.

   Vereen filed her brief on May 22, 2007.  Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J.

(Docket No. 42).  One week later, on May 29, 2007, the Supreme Court issued its decision in

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S.Ct. 2162 (2007).  In *Ledbetter*, the

Supreme Court described a "pay-setting decision" as "a discrete act that occurs at a particular

point in time, . . ." *Ledbetter*, 127 S.Ct. at 2165.  Justice Alito, who authored the opinion of the

Court in *Ledbetter*, distinguished Justice Brennan's statement in *Bazemore* and observed:

> [W]hen an employer adopts a facially discriminatory pay structure that puts some
> employees on a lower scale because of race, the employer engages in intentional
> discrimination whenever it issues a check to one of these disfavored employees.
> An employer that adopts and intentionally retains such a pay structure can surely
> be regarded as intending to discriminate on the basis of race as long as the
> structure is used.

*Id.* at 2173.  Although the state of the law may not have been clear when Vereen filed her brief in

this case, it is now clear that "a new Title VII violation does not occur and a new charging period

is not triggered when an employer issues paychecks pursuant to a system that is 'facially

nondiscriminatory and neutrally applied.'" *Id.* at 2174 (quoting *Lorance v. AT&T Technologies, Inc.*, 490 U.S. 900, 911 (1989)).

A plaintiff pursuing a disparate-treatment claim under Title VII must establish both an "employment practice" and "discriminatory intent." *Id.* at 2171. These two elements, when combined, constitute an "*unlawful* employment practice." 42 U.S.C. § 2000e-2(a)(emphasis added). The argument advanced by Vereen was rejected by the Supreme Court because acceptance of that argument would negate the need for a plaintiff to establish the existence of "discriminatory intent" within the applicable charging period. *Ledbetter*, 127 S.Ct. at 2167 ("However, Ledbetter does not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998. Rather, she argues that the paychecks were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner *prior* to the EEOC charging period.")(emphasis in original).

Vereen appears to base some of her argument on the School District's refusal to renegotiate her salary. She, however, provides no evidence that discriminatory animus motivated that refusal. The crux of her argument appears to be the very line of reasoning rejected by the Supreme Court in *Ledbetter*. Vereen cites to no "pay-setting decision" occurring within the charging period, and she provides no evidence that any salary-related actions taken by the School District within that period of time were motivated by a discriminatory animus toward her. Under these circumstances, Vereen's salary-based claims under Title VII and the PHRA are time-barred. The court will grant the School District's motion for summary judgment with respect to those claims.

24

It is not clear whether Vereen asserts salary-based claims under § 1981. Count II contains a general allegation that she was "treated less favorably because of her race," as well as an averment stating that she suffered a tangible "loss of pay. . . ." Am. Compl. (Docket No. 12) at 6, ¶¶ 36, 40. Count II does not contain a specific averment similar to that contained in count I, which states that "Defendant did not increase Plaintiff's salary because of her sex." *Id.* at 5, ¶ 32. Nevertheless, Vereen appears to base her discriminatory pay claims, at least in part, on § 1981. For purposes of this analysis, the court will assume *arguendo* that Vereen intends to pursue a salary-based race discrimination claim under § 1981.

Prior to 1991, the race discrimination proscriptions contained within § 1981 were more narrow than those contained within Title VII. *Patterson*, 491 U.S. at 176 ("Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the *making* and *enforcement* of contracts.")(emphasis added). Some courts opined that wage discrimination claims relate more to "the **enjoyment of all benefits**, privileges, terms, and conditions of the contractual relationship" than they do to the *making* of the contractual relationship. *Malone v. Bodycote Heat Treating*, Civ. No. H-04-3940, 2007 U.S. Dist. LEXIS 65034, at *7 (S.D.Tex. Sept. 4, 2007)(emphasis in original). Other courts observed that wage discrimination claims may have been actionable under § 1981 prior to 1991 under circumstances in which the relevant discrimination occurred at the time of contract formation. *Palmer v. Stewart County Sch. Dist.*, 215 Fed.Appx. 822, 823-24 (11th Cir. 2007). It is unclear whether the beginning of Vereen's tenure as the principal of East Junior High School during the fall of 1999 involved the *formation* of a new contract, which would have made race discrimination on the part of the School District

25

actionable under the pre-1991 version of § 1981. *Patterson*, 491 U.S. at 179 ("This type of conduct, reprehensible though it be if true, is not actionable under § 1981, which covers only conduct at the initial *formation* of the contract and conduct which impairs the right to enforce contract obligations through legal process.")(emphasis added). The court notes that Vereen continued to receive her annual salary of $60,500.00 until the completion of the new Act 93 agreement, which would provide some support for the argument that the terms of her employment were governed by a pre-existing contract. Vereen testified that she participated in meetings necessary to conclude the new Act 93 contract. Vereen Dep. at 17 (Docket No. 44-2 at 5). Thus, it may be that Vereen's salary-based claim under § 1981 would have been actionable before the enactment of the Civil Rights Act of 1991. In any event, the court need not decide this issue, since its resolution will not impact the court's decision on the motion for summary judgment.

Assuming *arguendo* that Vereen's § 1981 wage discrimination claim was subject to the four-year statute of limitations established by Congress rather than Pennsylvania's two-year statute of limitations, the claim was commenced more than four years after the claim would have been actionable and thus even applying the longer limitations period that claim is time- barred. Vereen's placement on the salary schedule occurred immediately after the Board approved the Act 93 agreement on November 10, 1999. This case was not commenced until April 7, 2006. Even if section 1658(a)'s four-year limitations period governs this claim, roughly six and a half years elapsed between the alleged violation and the commencement of this action.

The court of appeals has interpreted the standard enunciated in *Morgan* broadly enough to encompass actions brought under 42 U.S.C. § 1983. *O'Connor*, 440 F.3d at 128-29. Unlike

section 1983, which creates no substantive rights under federal law, § 1981 has been construed to provide substantive protection against race discrimination that is coextensive with that provided by Title VII. *Schurr*, 196 F.3d at 498-99. Since the *Morgan* framework for identifying "discrete acts" of discrimination applies to claims brought under section 1983, it follows *a fortiori* that it applies to claims brought under § 1981. *Ledbetter*, of course, applied *Morgan* in the wage discrimination context. *Ledbetter*, 127 S.Ct. at 2169. The court has already determined that, under *Ledbetter*, the paychecks received by Vereen within the charging period did not constitute "discrete" violations of Title VII. The same standard applies to Vereen's § 1981 claim. The paychecks that Vereen received during the four years prior to the commencement of this action did not constitute "discrete" violations of § 1981, even if it is assumed that her placement on the salary scale was motivated by a discriminatory animus based on race.[5] Hence, Vereen's § 1981 claim in count II of the amended complaint is barred by section 1658(a)'s four-year statute of limitations to the extent that it is based on Vereen's salary and summary judgment will be granted in favor of defendant with respect to this claim.

## B. The School District's Failure to Promote Vereen to the Position of Assistant Superintendent

Counts I and II of the amended complaint also allege that the School District did not select Vereen for the position of assistant superintendent because of her sex and race. Vereen contends that the failure of the School District to select her constituted violations of Title VII and the PHRA, and of § 1981 to the extent that the decision was based on her race. As noted earlier,

---

[5]Vereen does not argue that the Act 93 agreement was *itself* discriminatory. See *Ledbetter*, 127 S.Ct. at 2174.

the protections afforded by these statutes have been construed to be coextensive. *Schurr*, 196

F.3d at 498-99; *Stultz*, 835 A.2d at 759. Consequently, the court's analysis of Vereen's Title VII

claims for sex and race discrimination will also be dispositive of her parallel claims under the

PHRA and her race discrimination claim under § 1981.[6]

Because Vereen did not adduce direct evidence of discrimination, the Supreme Court's

analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of*

*Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the applicable framework for

allocating the requisite burdens of proof and production in this case.[7] In this kind of federal

employment discrimination case, the plaintiff must establish a prima facie case of impermissible

discrimination. *McDonnell Douglas*, 411 U.S. at 802. If a prima facie case is established, the

defendant must articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an

adverse manner. *Id.* at 802-03. If the defendant overcomes this hurdle, the plaintiff must

demonstrate that the reasons given by the defendant for the treatment are merely a pretext for

illegal employment discrimination. *Id.* at 804-05. Evidence that an employer's stated reasons for

an adverse employment decision are unworthy of credence is a form of circumstantial evidence

---

[6]Since Vereen's failure-to-hire claim under § 1981 relates to the School District's alleged failure to enter into a new contract with her, this claim would have been actionable under § 1981 before the passage of the Civil Rights Act of 1991. *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 168-70 (3d Cir. 1991). Hence, it is subject to Pennsylvania's two-year statute of limitations. 42 PA. CON. STAT. § 5524(2), (7). It, however, is undisputed that Vereen's failure-to-hire claims were all filed in a timely manner.

[7]The *McDonnell Douglas-Burdine* framework does not apply in employment discrimination cases in which the plaintiff presents direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). In that kind of case, there is no need for an *inference* of discrimination, since the discrimination is itself readily transparent. "Direct evidence" of discrimination is evidence that is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).

that a plaintiff can use to establish the existence of unlawful discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

The requirement that the plaintiff establish a prima facie case of forbidden discrimination "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). A prima facie case raises an inference of unlawful discrimination because the court presumes that the challenged actions, if left unexplained, were "more likely than not based on the consideration of impermissible factors." *Id.* The *McDonnell Douglas* framework "was never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). In *Jones v. School District of Philadelphia*, 198 F.3d 403 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case" and that "a prima facie case cannot be established on a one-size-fits-all basis." *Id.* at 411. Thus, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. U. S. Postal Service*, 352 F.3d 789, 797-98 (3d Cir. 2003).

In order to establish a prima facie case of discrimination in a failure-to-hire case such as this, Vereen must show that: (1) she is a member of a class of persons protected under the applicable anti-discrimination statutes; (2) she applied for, and was qualified for, the position of assistant superintendent; (3) she was rejected despite her qualifications; and (4) her rejection occurred under circumstances giving rise to an inference that the decision was based on an impermissible discriminatory criterion.[8] *Hoechstetter v. City of Pittsburgh*, 248 F.Supp.2d 407,

---

[8]The fourth element is stated in a general manner in order to accommodate different theories of potential liability. Although courts often state this element in a way which would require a showing that the person chosen for the position at issue was outside of the relevant protected class, that kind of showing is not always necessary.

409-410 (W.D.Pa. 2003).  The ultimate inquiry, of course, is whether Vereen was not chosen for the position of assistant superintendent *because of her sex* or *because of her race*.  42 U.S.C. § 2000e-2(a).  Exactly what the words "because of" mean, in this context, can only be understood by reference to the statutory text.

The Civil Rights Act of 1991 added the following language to Title VII:

> **(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices.**  Except as otherwise provided in this [title 42 U.S.C. § 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m); Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075 (1991).  In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 220 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit held that this amendment, which added section 2000e-2(m) to Title VII, did not alter the pre-existing distinction between "pretext" cases and so-called "mixed-motive" cases, and that plaintiffs proceeding under a "pretext" theory of discrimination must still show that the relevant discriminatory criterion was a *determinative* (rather than merely a *motivating*) factor behind the employment practice alleged to be unlawful. The United States Court of Appeals for the Third Circuit in *Watson* distinguished these two kinds of cases by reference to the "direct evidence" requirement discussed in Justice O'Connor's opinion concurring in the judgment in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

---

*Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 353 (3d Cir. 1999)("Even if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class–which in the present context is presumably true of all but the most misogynistic employers–and does not establish that the employer did not fire the plaintiff on the basis of her protected status."). The touchstone of the inquiry is whether the circumstances allegedly giving rise to an inference of illegal discrimination are of *evidentiary value*, not whether they meet the particularized requirements of some mechanical formula.  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996).

*Watson*, 207 F.3d at 212-20. In *Watson* the court of appeals concluded that § 2000e-2(m)

overruled only the portion of Justice O'Connor's *Price Waterhouse* concurrence which held that

an employer could avoid a finding of liability by establishing that it would have made the same

employment-related decision even if it had not considered the impermissible criterion. *Id.*

*Watson's* analyses was undercut by the Supreme Court's decision in *Desert Palace v. Costa*, 539

U.S. 90 (2003). In *Desert Palace*, the Supreme Court made clear that the statutory language of §

2000e-2(m) should not be read solely within the context of Justice O'Connor's *Price Waterhouse*

concurrence. *Desert Palace*, 539 U.S. at 98 ("Like the Court of Appeals, we see no need to

address which of the opinions in *Price Waterhouse* is controlling: the third step of petitioner's

argument is flawed, primarily because it is inconsistent with the text of § 2000e-2(m)."). The

Supreme Court held that a plaintiff need not present "direct evidence" of discrimination in order

to obtain a "mixed-motive" instruction under section 2000e-2(m), and that a court may give such

an instruction where the plaintiff has presented "sufficient evidence for a reasonable jury to

conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin

was a motivating factor for any employment practice." *Id.* at 101 (internal quotation marks

omitted).

 *Desert Palace* did not address the question whether the Civil Rights Act of 1991

eradicated the distinction between "pretext" cases and "mixed-motive" cases, or whether section

2000e-2(m) applies in "pretext" cases if a distinction still exists. *Id.* at 94 n.1 ("This case does

not require us to decide when, if ever, § 107 applies outside of the mixed-motive context."). The

central holding in *Desert Palace* obliterated the "direct evidence" line of demarcation recognized

by the Court of Appeals in *Watson*. <u>Compare</u> *Desert Palace*, 539 U.S. at 99 ("Moreover,

Congress explicitly defined the term 'demonstrates' in the 1991 Act, leaving little doubt that no special evidentiary showing is required."), with *Watson*, 207 F.3d at 218 ("By contrast, the term 'demonstrates' is not the most apt choice if the drafters wanted to describe, not just cases in which the plaintiff offers 'direct' evidence of discriminatory animus, but also the great number of disparate treatment cases in which the plaintiff, proceeding under *McDonnell Douglas*, establishes the elements of a prima facie case and urges the factfinder to infer discriminatory animus from the employer's asserted failure to offer a credible alternative reason for the contested employment action.").

If section 2000e-2(m) does not apply outside of the "mixed-motive" context, it is not clear how "mixed-motive" cases and "pretext" cases should be distinguished in the aftermath of *Desert Palace*. The distinction had previously rested on whether direct evidence of discrimination was present. *Starceski*, 54 F.3d at 1096 n.4 (distinguishing between "pretext" cases and "mixed-motive" cases on the basis of whether "direct evidence" of discrimination is present); *Fuller v. Phipps*, 67 F.3d 1137, 1143 (4th Cir. 1995)("Thus, whether a case is a pretext or mixed-motive case ultimately hinges on the strength of the evidence establishing discrimination."). In any event, however, it is clear that the same case can proceed simultaneously under both theories. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 781-782 (3d Cir. 1994). Since direct evidence of discrimination is *not* required in order for a plaintiff to obtain a "mixed-motive" instruction under § 2000e-2(m), the court must proceed on the assumption that Vereen can defeat the School District's motion for summary judgment by showing that her race or gender was a *motivating* or a *determinative* factor in the decision not to hire her as the assistant superintendent. *See Houser v. Carpenter Technology Corp.*, 216 Fed.Appx. 263, 265

(3d Cir. 2007)("Even if a 'mixed motive' analysis were appropriate at the summary judgment stage, which our court has not addressed, Houser cannot succeed under a 'mixed motives' approach, because Houser points to no evidence that would lead us to conclude that age played any role in his termination."). After all, the summary judgment inquiry is inextricably linked with what a reasonable *jury* could or could not decide, which can only be determined by reference to *what* the jury may ultimately be asked to consider. *Blaylock v. City of Philadelphia*, 504 F.3d 405, 412-14 (3d Cir. 2007).

The School District does not appear to contest Vereen's prima facie case of sex or race discrimination, opting instead to rely on its alleged legitimate, nondiscriminatory reasons for hiring Palmiero. Vereen argues that there is a genuine issue of material fact concerning whether the School District hired the *most qualified individual* for the position. It is worth noting that the relevant anti-discrimination statutes do not require covered employers to hire or select the most qualified applicants when vacancies arise. What matters is whether the School District failed to select Vereen *because of her sex or race*, not whether the School District's decision not to select her was "wise, shrewd, prudent or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).

Title VII, the PHRA and § 1981 do not require an employer to hire the *most qualified* applicant; rather a refusal to hire is prohibited if the decision is based upon an impermissible discriminatory criterion. Evidence that an employer hired a less qualified applicant, of course, may support a finding of unlawful discrimination, but it is not *itself* sufficient to establish an actionable violation of the law. For purposes of resolving a summary judgment motion, evidence that a less qualified applicant was hired can be helpful to a plaintiff only if it demonstrates "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in an employer's proffered reasons for not hiring the plaintiff that a reasonable jury could find them to be "unworthy of credence." *Fuentes*, 32 F.3d at 765. Where an employer "'proffers a bagful of legitimate reasons'" for its action, "'and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder.'" *Tomasso v. The Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006) (quoting *Fuentes*, 32 F.3d at 764 n.7). It must be remembered that "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales." *Tomasso*, 445 F.3d at 707.

The evidence of record here reflects that thirty-six people applied to be the School District's assistant superintendent. Eight of the applications, including Vereen, were selected to be interviewed. Five of the eight individuals chosen for interviews were women. One male applicant did not show up for his interview, leaving only seven applicants to compete for the position. The interviewers were both women. Wilson is an African-American woman. Four of the final seven applicants were selected for a second round of interviews, two of whom were Vereen and Palmiero. Each of these four individuals was asked the same questions. It is undisputed that Palmiero received the highest scores among the four finalists. In an affidavit, Wilson stated that Vereen's scores were the lowest. Palmiero was the only candidate with a reading specialist certification and a certification in curriculum and instruction. Wilson stated that Palmiero was chosen for the position because of his background in reading, his interview scores, his central office experience, and his ability to integrate technology into the curriculum.

Vereen contends that Palmiero was not qualified for the position because he did not have five years of experience as a "building level administrator." Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (Docket No. 42) at 7-8. Experience as a "building level administrator," however, does not appear as a qualification for this position in the advertisement posted by the School District to solicit applications. According to the postings, the qualifications included:

1. Pennsylvania letter of Eligibility
2. Successful experience in school administration.
3. Experience with Special Education
4. Extensive experience in curriculum development.
5. Experience in K-12 staff development.
6. Experience in school reform efforts.

Formal job descriptions "often bear little resemblance to the duties an employee actually is expected to perform. . . ." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1962 (2006). In any event, the evidence of record does not support Vereen's assertion that Palmiero was unqualified to be the School District's Assistant Superintendent because he lacked five years of experience as a "building level administrator."

Vereen's entire theory about her sex or race being a motivating factor in the School District's decision to hire Palmiero instead of her appears to be based only on her personal beliefs and hearsay from unidentified persons. In her deposition, she testified as follows:

Q.      Is that the only reason you believe you have been treated differently, because of your sex, female, and race was because you were placed on the salary schedule?

A.      Yes, and the fact that I did not secure the position that I was qualified for.

Q.      What position was that?

A.      Assistant Superintendent.

Q.  Why do you believe that you were more qualified than Mr. Palmero, who was selected?

A.  I submitted my credentials and I did talk about my years of experience as–and I do have to say they were successful years of experience as a building level Principal.  I feel that, in fact, there were individuals, and I don't know if this is hearsay or not, but there were individuals who have told me that there were discussions in the district about the need for balance in terms of the key Administrators in the district, balance by race and by gender.

Q.  Who were those discussions with?

A.  I did not initiate discussions.  Individuals approached me.  Individuals who are employees of the district.  And as far as who the individuals were, several individuals approached me, and I don't recall the identity of these individuals.

Q.  But they're current employees?

A.  Yes.

Q.  When did they approach you?

A.  Around the time that Mr. Palmero was hired.  Around the time that I interviewed for the position.

Q.  You can't recall any of these individuals' names?

A.  No.  It's just casual discussions that they had and casual words that they had to me.  That they said to me, I should say.

Vereen Dep. at 99-100 (Docket No. 44-2 at 26).

As Vereen's testimony illustrates, her view that she was not hired because of her sex or race appears to be based on unsubstantiated rumors, the sources of which are unknown even to her.  Speculation of this kind is insufficient to implicate unlawful discrimination on the part of the an employer and would not be sufficient for a reasonable finder of fact to conclude that an employer's proffered reasons for making a personnel decision were pretextual.  Vereen's beliefs

are not sufficient to defeat the School District's motion for summary judgment with respect to the decision not to hire her as an assistant superintendent.[9]  Because the evidence of record is insufficient for a reasonable jury to render a verdict in favor of plaintiff in her failure to hire claims under Title VII, the PHRA and § 1981, the court will grant the School District's motion for summary judgment with respect to counts I and II of the amended complaint.

## C.  The Equal Pay Act

In count III of the amended complaint, Vereen alleges that the School District's failure to pay her a higher salary constituted a violation of the Equal Pay Act.  The Equal Pay Act was signed into law by President John F. Kennedy on June 10, 1963.  Pub. L. No. 88-38, 77 Stat. 56 (1963).  This legislation added the following language to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"):

> **(d) Prohibition of sex discrimination.**  (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage differential in violation of this

---

[9]The decision to not hire Vereen as an assistant superintendent appears to have been made by Wilson, who, like Vereen, is an African-American woman.  Members of a protected class may sometimes discriminate against other members of that same class.  *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).  "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."  *Castaneda v. Partida*, 430 U.S. 482, 499 (1977).  Wilson, the apparent decisionmaker at the time of the challenged personnel action, being a member of the same protected classes as Vereen, tends to undermine Vereen's contention that her sex or race was a factor in her not being hired.  *Cf. Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 354 (3d Cir. 1999)("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff in this situation to counter (or explain) such evidence.").

subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1). Vereen avers that the School District paid her less than men performing comparable work, and she seeks lost wages, liquidated damages, attorney's fees and costs to remedy the alleged Equal Pay Act violation.

In order to establish a prima facie case under the Equal Pay Act, Vereen must show that the School District paid employees of the opposite sex (i.e., males) differently for performing equal work (i.e., "work of substantially equal skill, effort and responsibility, under similar working conditions"). *EEOC v. Del. Dep't of Health & Soc. Services*, 865 F.2d 1408, 1413-14 (3d Cir. 1989). If Vereen makes that showing, the burden shifts to the School District to demonstrate the applicability of one of four affirmative defenses enumerated in the Equal Pay Act. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195-97 (1974). Because the employer bears the burden of proof at trial with respect to the affirmative defenses, an employer cannot prevail at the summary judgment stage (assuming that the plaintiff has established a prima facie case) unless it can prove the existence of one of the affirmative defenses "so clearly that no rational jury could have found to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414. The United States Court of Appeals for the Third Circuit explained in *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000), that an employer seeking to defeat a prima facie Equal Pay Act case at the summary judgment stage cannot prevail without producing "sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Id.* at 108. This framework essentially requires a plaintiff to establish only the mere *existence* of disparate pay for the performance of equal work, leaving the

defendant with the burden to establish that any demonstrated pay differential is *not* due to the aggrieved employee's sex. 29 U.S.C. § 206(d)(1)(iv)(using the words "factor other than sex" to create an affirmative defense); *Corning Glass Works*, 417 U.S. at 196 ("Again, while the Act is silent on this question, its structure and history also suggest that once the Secretary has carried his burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions."). A plaintiff asserting an Equal Pay Act claim need not prove the existence of "intentional discrimination." *Ledbetter*, 127 S.Ct. at 2176.

The timeliness issue under the Equal Pay Act also differs from that under Title VII. Congress has provided that an action under the Equal Pay Act

> may be commenced within two years after the cause of action accrued, and [that] every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued;

29 U.S.C. § 255(a). In *Miller v. Beneficial Management Corp.*, 977 F.2d 834, 843-44 (3d Cir. 1992), the court of appeals recognized that the timeliness of an Equal Pay Act claim is measured from the date of an aggrieved employee's last paycheck rather than from the date of the relevant pay-setting decision. Prior to the Supreme Court's decision in *Ledbetter*, the court of appeals had relied on both *Bazemore* and *Miller* to apply a similar rule in Title VII cases. *Cardenas v. Massey*, 269 F.3d 251, 257-58 (3d Cir. 2001)(applying the reasoning in *Miller* in a Title VII case). In light of *Ledbetter*, it is now clear that the timeliness of an EEOC charge under Title VII must be measured from the date of the discriminatory pay-setting decision, and that an aggrieved employee's receipt of paychecks reflecting an earlier instance of discrimination does not

constitute a distinct Title VII violation (unless, of course, the pay structure is itself facially discriminatory, as it was in *Bazemore*). The Supreme Court expressly acknowledged that the timeliness of an Equal Pay Act claim must be measured from the date of the plaintiff's last paycheck rather than from the date of the allegedly discriminatory pay-setting decision. *Ledbetter*, 127 S.Ct. at 2176 ("If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts.")(footnote omitted). Thus, the *Miller* standard continues to govern claims under the Equal Pay Act. Since the statute of limitations remains in force, however, a plaintiff's recovery under the Equal Pay Act is limited to damages resulting from unequal pay within the applicable limitations period. *Nealon v. Stone*, 958 F.2d 584, 591 n.5 (4th Cir. 1992); *Campana v. City of Greenfield*, 102 F.Supp.2d 1063, 1065 (E.D.Wis. 2000).

Vereen commenced this action on April 7, 2006. Any damages sustained by Vereen related to paychecks reflecting unequal wages received prior to April 7, 2004 (or April 7, 2003, if Vereen is able to establish a "willful" violation) are not recoverable at this point. Vereen may, however, use male employees employed by the School District prior to the limitations period as comparators for purposes of establishing her prima facie case. In *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336 (4th Cir. 1994), the United States Court of Appeals for the Fourth Circuit explained:

> The discriminatory act at issue in the instant case is [the employer's] payment of unequal wages to [the plaintiff]. [The employer] has mischaracterized the act as 'paying [the comparator] more money' when the violation is actually paying [the plaintiff] less money. . . . Statutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action. In other words, the statute of limitations does not operate to limit the evidence [the plaintiff] may introduce regarding her co-workers. In the context of the Equal Pay Act, the statute of limitations does not dictate which co-workers the plaintiff may submit as comparators.

*Brinkley-Obu*, 36 F.3d at 346 (footnote omitted).  With that in mind, the court now turns to the evidence relevant to Vereen's Equal Pay Act claim.

In order to establish a prima facie case under the Equal Pay Act, Vereen must show that she was paid less than males for performing "work of substantially equal skill, effort and responsibility, under similar working conditions."  *Del. Dep't of Health*, 865 F.2d at 1413-14.  The statutory standard of "equal skill, effort, and responsibility" does not provide a valid excuse for a covered employer to pay employees of one sex less than employees of the opposite sex on account of inconsequential differences in the content of their jobs.  *Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148, 152-53 (3d Cir. 1976).  Trivial differences in job duties between employees of different sexes cannot be used by an employer to defeat an employee's prima facie case under the Equal Pay Act.

The School District argues that Vereen failed to provide sufficient evidentiary support to establish a prima facie case.  Although it appears that many of the employees mentioned in Vereen's affidavit may have different functions, the record indicates – contrary to the School District's assertion – that at least three males were paid significantly more than Vereen for performing substantially equal work under *similar* working conditions.  29 U.S.C. § 206(d)(1).  When Vereen acted as the principal of East Junior High School in 1999, she filled in for Fischer, a male.  As the principal, Fischer's salary was significantly higher than Vereen's later salary of $69,045.12.  The School District contends that Fischer's higher salary was justified by both his lengthy service as an employee of the School District and his salary demand.

Vereen refers to Morgan, who was hired on August 6, 2001, to be the principal at East Junior High School as another comparator. The School District cannot reasonably contend that the "work" performed by Vereen and Morgan was not equivalent, since Morgan assumed the duties of the same job held by Vereen at the time of her placement on the Act 93 salary schedule. The School District apparently decided to transfer Vereen from East Junior High School to Fairless Intermediate School while Vereen was away on a two-week vacation. Morgan's starting salary as the principal of East Junior High School was $74,631.00. Wilson attributes Morgan's starting salary to his salary demand, arguing the higher salary was necessary to secure his employment. Morgan had received higher salaries while working for other school districts throughout a career spanning more than three decades. While the School District's reasons for paying Fischer and Morgan higher salaries for serving in the same capacity as Vereen may be relevant to the affirmative defenses available to the School District under the Equal Pay Act, they do not negate Vereen's prima facie case.

Vereen also refers to Thomas, who was apparently the principal of Dickson Intermediate School as of May 22, 2007. Vereen states that while her position at Fairless Intermediate School is equivalent to Thomas' position at Dickson Intermediate School in terms of job duties and expectations, her annual salary is presently about $10,000.00 less than that of Thomas. *Id.* Wilson did not address the present pay differential between Vereen and Thomas. On August 6, 2001, Thomas was hired as the principal at West Junior High School at an annual salary of $80,441.00. Wilson attributes Thomas' starting salary of over $80,00 to his salary demand, which she argues was necessary to secure his employment. Vereen appears to have been still making $69,045.12 per year, pursuant to the Act 93 agreement at the time of Thomas' hiring.

The School District acknowledges that the Act 93 agreement was effective through June 30, 2004. The School District does not contend that Thomas' duties at West Junior High School were materially different from Vereen's duties at East Junior High School, and argues only that factors other than race or sex resulted in the higher salaries enjoyed by Morgan and Thomas. The record before the court reflects that Vereen was paid significantly less than three males[10] for performing equal work under similar working conditions. Vereen has adduced sufficient evidence for a reasonable jury to conclude that she established a prima facie case under the Equal Pay Act.[11]

Since Vereen satisfied her burden of establishing a prima facie case, the burden shifts to the School District to prove one of the Equal Pay Act's four affirmative defenses "so clearly that no rational jury could [find] to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414. The School District is not arguing that the pay discrepancy identified by Vereen was the result of "a seniority system," "a merit system," or "a system which measures earnings by quantity or quality of production." Def.'s Reply to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (Docket No. 55) at 7-12 (arguing, in a general sense, that the relevant pay differentials were based on factors "other than sex"). Since those affirmative defenses are not asserted, the School District's arguments must be evaluated in accordance with the Equal Pay Act's catch-all affirmative defense, which permits an employer to avoid liability by demonstrating that unequal pay for equal work is based on any factor "other than sex." 29 U.S.C. § 206(d)(1). As noted earlier, this standard differs meaningfully from the standard applicable under Title VII. In a Title VII case,

---

[10]By identifying three legitimate comparators, the court does not mean to imply the absence of any others.

[11]Vereen's prima facie case is buttressed by the testimony of Bostick (an African-American woman), who testified that she was paid less than a white male who performed the same duties as her.

the plaintiff, such as Vereen, must establish that the employer discriminated against her with respect to the terms of her compensation *because of* her sex. In contrast, in an Equal Pay Act case, the defendant employer relying on the Equal Pay Act's catch-all defense must establish that an aggrieved employee, such as Vereen, is *not* being paid less *because of* her sex. *Ledbetter*, 127 S.Ct. at 2176 (recognizing that a plaintiff seeking to establish a violation of the Equal Pay Act need not prove the existence of "intentional discrimination").

The School District's arguments concerning the catch-all defense are based on the Act 93 agreement (which considered the comparators' experience as a factor) and the comparators' salary demands.[12] There are genuine issues of material fact relating to the School District's contentions. With respect to the Act 93 agreement itself, Bostick testified that the School District had considerable discretion as to where on the pay scale a particular employee would be placed. The existence of that discretion is supported by other evidence in the record. In an affidavit, Wilson acknowledged that Grimm had made adjustments to the salaries of some assistant principals serving at Woodland Hills High School on the ground that these individuals were expected to attend athletic events during evening hours. Vereen's position is buttressed by documentary evidence, which indicates that Wilson may have told Vereen that the School District had "the *prerogative* to place an administrator at any level" on the Act 93 pay scale. In light of this evidence, there are genuine issues of material fact regarding whether the School

---

[12]The "experience" factor, although characterized by the School District as being something independent of the Act 93 agreement, appears to be merely one factor considered for the overall purpose of determining where on the pay scale a particular employee should be placed. App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume II, Tab H (Docket No. 36-2 at 7)("Of Group #1 school districts, which comprise the 13 largest, there are 17 middle and junior high school principals. Only 4 of these have fewer years of service than you, and 2 of these earn considerably less than you. Stated differently, you were given a principalship earlier in your career than your counterparts, or they too had to wait years before they were at the top of the scale.").

District was compelled by the Act 93 agreement to keep Vereen at an annual salary of $69,045.12.

The School District's argument concerning the "salary demands" made by Fischer, Morgan and Thomas is also unavailing for purposes of summary judgment. If the School District was able to meet the salary demands made by these three males, it is not clear why Vereen's own salary demands were rebuffed. Even assuming that the School District needed to pay Fischer, Morgan and Thomas higher salaries in order to secure their employment, the School District did not seem as concerned about what it would take to secure Vereen's continued employment. In Herman's letter of March 29, 2001, he responded to Vereen's complaints by suggesting that she "test the market in other school districts." App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume II, Tab H (Docket No. 36-2 at 7). This letter was written just four months before Morgan and Thomas were hired at salaries high enough to secure their employment. Morgan was apparently placed in Vereen's position at East Junior High School, causing Vereen to be transferred to Fairless Intermediate School. This replacement of Vereen may be sufficient for a reasonable jury to conclude that the School District's alleged need to secure Morgan's employment was not true.

In light of the record, the court cannot conclude that a reasonable jury could find that the reasons proffered by the School District *actually motivated* the wage disparities identified by Vereen. *Stanziale*, 200 F.3d at 108. The School District failed to meet its burden of demonstrating its reliance on a factor other than sex "so clearly that no rational jury could [find] to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414. The School District's motion for summary judgment must be denied with respect to the Equal Pay Act claim of plaintiff.

## D. Retaliation Claims

Count IV of the amended complaint asserts claims for retaliation under Title VII, the PHRA, § 1981 and the Equal Pay Act. Vereen alleges that the School District retaliated against her for engaging in protected activity (i.e., seeking redress for her salary-based complaints) by failing to hire her as an assistant superintendent, subjecting her to unwarranted criticism, and failing to impose harsher discipline on the student who allegedly "assaulted" her.

Title VII's anti-retaliation provision provides:

> **§ 2000e-3. Other unlawful employment practices**
>
> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.** It shall be an unlawful employment practice for any employer to *discriminate against* any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this [title][42 U.S.C. §§ 2000e-2000e-17], or because he has made a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding, or hearing under this [title][42 U.S.C. §§ 2000e-2000e-17].

42 U.S.C. § 2000e-3(a)(emphasis added). The PHRA contains its own anti-retaliation provision, which provides:

> **§ 955. Unlawful discriminatory practices**
>
> It shall be an unlawful discriminatory practice . . .
> * * *
> (d) For any person, employer, employment agency or labor organization to *discriminate in any manner against* any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, *in any manner*, in any investigation, proceeding or hearing under this act.

43 Pa. Stat. Ann. § 955(d)(emphasis added).  The statutory language contained in the PHRA's

anti-retaliation provision is similar to that contained in Title VII's anti-retaliation provision in

that it proscribes *discrimination against* an individual who assists (or participates in) an

investigation *in any manner*.  Because the Pennsylvania courts have not held to the contrary, the

United States Court of Appeals for the Third Circuit has explained that the PHRA's anti-

retaliation provision should be construed coextensively with Title VII's anti-retaliation provision.

*Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  The court of appeals

has also concluded that retaliation claims asserted under § 1981 should be examined in

accordance with the framework applicable to retaliation claims asserted under Title VII.  *Verdin*

*v. Weeks Marine, Inc.*, 124 Fed.Appx. 92, 97 (3d Cir. 2005)(treating a § 1981 retaliation claim as

identical to a Title VII retaliation claim).

     As noted earlier, the Equal Pay Act amended the FLSA.  Pub. L. No. 88-38, 77 Stat. 56

(1963).  The FLSA contains a provision which makes it unlawful for any person

> to discharge or *in any other manner discriminate against* any employee because
> such employee has filed any complaint or instituted or caused to be instituted any
> proceeding under or related to [the FLSA], or has testified or is about to testify in
> any such proceeding, or has served or is about to serve on an industry committee;

29 U.S.C. § 215(a)(3)(emphasis added).  In *Marriot v. Audiovox Corp.*, No. 04-cv-1307, 2006

U.S. Dist. LEXIS 92796, at *24-27 (W.D.Pa. Dec. 22, 2006), this court held that informal

complaints to an employer constitute "protected activity" for purposes of the FLSA's anti-

retaliation provision, which is applicable to Equal Pay Act retaliation claims.  Thus, the court's

treatment of Vereen's retaliation claims under Title VII, the PHRA, § 1981 and the Equal Pay

Act will be examined together.

In order to establish a viable retaliation claim, Vereen must demonstrate that: (1) she engaged in conduct protected under the relevant statutory provision; (2) the School District took a materially adverse[13] action against her; and (3) there was a causal relationship between her protected conduct and the School District's materially adverse response to that conduct.[14] *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). With respect to the first element, it is sufficient for Vereen to show that she was acting under a good faith, reasonable belief that the School District was engaging in an unlawful employment practice. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996); *Griffiths v. Cigna Corp.*, 988 F.2d 457, 468 (3d Cir. 1993). Vereen, however, cannot sustain a valid retaliation claim if she opposed conduct which was obviously legal under the circumstances. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 271-72 (2001). Here, the court has already determined that Vereen's Equal Pay Act claim is sufficiently supported by the record to defeat the School District's motion for summary judgment. The School District was entitled to summary judgment with respect to Vereen's salary-based claims under Title VII, the PHRA and § 1981 because those claims are time-barred. The record contains sufficient evidence to support Vereen's contention that she acted under a good faith, reasonable belief that her complaints were in opposition to unlawful conduct on the part of the School District.

---

[13]The United States Court of Appeals for the Third Circuit did not use the words "materially adverse" in *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). The court uses those words in this case in order to incorporate the standard adopted by the Supreme Court in *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405, 2415 (2006).

[14]The issue of causation in a retaliation case is analyzed in accordance with the *McDonnell Douglas* burden-shifting framework. *Marra v. Philadelphia Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

The second element of a retaliation claim centers on the Supreme Court's decision in *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405 (2006). In *Burlington Northern*, a Title VII case, the Supreme Court held that "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington Northern*, 126 S.Ct. at 2409. The words "discriminate against" were construed to prohibit a broad category of retaliatory actions taken by an employer. *Id.* at 2411. "Title VII's anti-retaliation provision does not merely prohibit an employer from *discriminating against* an individual 'with respect to his compensation, terms, conditions, or privileges of employment,' but instead sweeps broadly enough to prohibit other 'materially adverse' actions taken in retaliation for activity protected under the statute." *Johnson*, 451 F.Supp.2d at 710 (emphasis added). A plaintiff pursuing a retaliation claim must demonstrate that the alleged retaliatory action "would have been *materially* adverse to a reasonable employee or job applicant." *Burlington Northern*, 126 S.Ct. at 2409 (emphasis added). The Supreme Court has formulated this standard to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 2416.

Vereen's retaliation claims focus on three specific actions taken by the School District. Vereen alleges that the School District retaliated against her "by subjecting her to unwarranted criticism, [by] denying her a promotion to [the position of] Assistant Superintendent that she otherwise should have gotten, and by failing to follow its own procedures regarding student behavior." Am. Compl. (Docket No. 12) at 7-8, ¶ 52. The "unwarranted criticism" averment refers to Vereen's performance evaluation for the 2005/2006 school year, which she believes to

have been unjustifiably critical of her. The "procedures regarding student behavior" averment concerns the School District's failure to impose discipline on a fourth-grade student who allegedly asserted, plaintiff beyond a ten-day suspension.

The School District's failure to hire Vereen for the position of assistant superintendent is sufficient to satisfy *Burlington Northern*'s "materially adverse" standard, since such a tangible employment decision may certainly dissuade a reasonable employee from "complaining or assisting in complaints about discrimination." *Burlington Northern*, 126 S.Ct. at 2416. The issue of causation in a retaliation action, however, must be examined in accordance with the *McDonnell Douglas-Burdine* burden-shifting framework. *Marra*, 497 F.3d at 300. The court has already determined that the School District articulated legitimate, nondiscriminatory reasons for its decision to hire Palmiero, and that Vereen failed to cast sufficient doubt on those reasons to defeat the School District's motion for summary judgment. That determination applies with equal force to Vereen's retaliation claims. Since Vereen cannot refute the School District's nondiscriminatory reasons for hiring Palmiero rather than her, she cannot establish the element of causation (i.e., that her protected activity *caused* the School District not to hire her for the position of assistant superintendent). Thus, the School District's motion for summary judgment must be granted with respect to the retaliation claims based on Vereen's unsuccessful application to be an assistant superintendent.

Vereen also bases some of her retaliation claims on the School District's failure to impose harsher discipline on a fourth-grade student who she claims to have assaulted her. This incident occurred in March 2006. The student allegedly took pencils away from another student at the end of a school day. When Vereen asked the student for the pencils, he refused to hand them

over. Vereen proceeded to take the student into another classroom, in the presence of a teacher acting as a witness. Vereen noticed that the student, who was sitting at a table, had a "metal disk" under his hand. Fearing that the disk could be used as a weapon, Vereen took the disk away from the student, causing him to become angry. Vereen extended her arm on a wall near the doorway to the classroom, apparently for the purpose of communicating to the student that he was not free to leave. The student, who allegedly weighed between 160 and 170 pounds, wrestled Vereen's arm off of the wall, causing her to aggravate a pre-existing back condition.

As a result of this incident, the student received an initial out-of-school suspension lasting for a period of three days. After an informal hearing was held, this suspension was extended by seven days, making the total period of suspension last for ten days. Vereen wanted to take the student before the Board for a formal expulsion hearing, so she prepared the documentation needed to do so. Nevertheless, when Wilson and Palmiero arrived at the school to discuss the incident with Vereen, they informed her that they did not view the incident as an "assault," and that they did not believe that further disciplinary action was warranted. In an affidavit, Wilson described the incident by saying that the student "pushed his way out of the room." App. to Def.'s Concise Statement of Material Facts, Volume VI, Tab S (Docket No. 36-6 at 13, ¶ 26). Wilson stated that she did not recommend further disciplinary action (i.e., disciplinary action beyond the ten-day suspension which had already been imposed on the student) because the student had not been a disciplinary problem in the past, and because the incident itself had not been sufficiently serious to warrant a more aggressive disciplinary response. According to Wilson, Vereen's actions escalated the confrontation with the student.

In her deposition, Vereen testified that she had contacted the North Braddock Police Department about the incident. She indicated that police officers had told her that they did not wish to pursue the matter, since the student was only nine years old. Two weeks after the altercation, Vereen sought medical treatment for a pre-existing back condition. Medical personnel informed her that she was suffering from a pinched nerve. She later sought treatment from a chiropractor.

Vereen testified that other students had been taken before the Board for expulsion hearings. In one instance, a student assaulted some staff members (including Vereen), causing them to be rushed to the emergency room. In another instance, a student was subjected to an expulsion hearing for exposing himself to, and sexually harassing and/or assaulting, a female student. Vereen believed that the fourth-grade student who "wrestled" her arm off of the wall, or "pushed his way out of the room," should have been subjected to an expulsion hearing as well.

Vereen testified as follows concerning the School District's alleged retaliatory motive for not imposing harsher discipline on the fourth-grade student:

> Q.    Why do you think that because you filed a Complaint that this was criticism with regard to that? That they refused to have an expulsion hearing? How are those two linked together?
>
> A.    It's my belief that Dr. Wilson initially was supportive of me. She told me to let her know what I wanted to do. To me that was an indicator that she was supportive of what I felt needed to happen to the student. But it's also my belief that after she may have spoken to whether it's a Board member, Board members, it's just my belief that there was some discussion that I should not–that the case should not be taken.
>
> Q.    Was that discussion linked to the fact that you had filed a Complaint?
>
> A.    It's my belief it is. It is my believe [sic] that it is.

Vereen Dep. at 96.

Vereen relies on the School District's alleged departure from its "standard practice of referring any situation involving a physical assault by a student against a teacher" for an expulsion hearing as evidence of retaliatory animus. Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (Docket No. 42) at 11. The School District's failure to impose discipline on the fourth-grade student beyond a ten-day suspension, however, does not meet the standard of *material* adversity established by the Supreme Court in *Burlington Northern* (i.e., no reasonable jury could conclude that it would not dissuade a *reasonable* person from pursuing a charge of discrimination). *Burlington Northern*, 126 S.Ct. at 2416. While Vereen may have suffered an injury as a result of her altercation with the student, she cannot established that *she* was harmed by the School District's failure to pursue an expulsion hearing. While *inaction* by an employer in response to a legitimate complaint made by an employee may constitute a materially adverse retaliatory *action*, it is difficult to fathom how a *reasonable* principal or teacher could be dissuaded from filing an EEOC charge because his or her employer might refuse to impose harsh discipline (i.e., discipline beyond a ten-day suspension) on a nine-year-old who forcibly exits a classroom. The standard of *material* adversity was designed to "screen out trivial conduct" such as that presented here (i.e., a failure to pursue more aggressive disciplinary proceedings against a nine-year-old child). *Id.* at 2516.

Vereen's retaliation claims concerning the School District's failure to pursue further discipline against this fourth-grade student also fails under the third element of a retaliation claim – causation. In her deposition, Vereen appeared to extrapolate a retaliatory animus from Wilson's change of heart. Vereen Dep. at 96 (Docket No. 44-2 at 25). She stated that it was her "belief" that members of the Board had indicated to Wilson that further disciplinary action

should not be taken against the student, and that a retaliatory animus was motivating the attitude of those members. *Id.* That kind of speculation is inadequate to enable a reasonable jury to draw an inference of causation under these circumstances. While the parties appear to dispute the seriousness of the altercation between Vereen and this student and the appropriateness of the discipline imposed, the court finds that no reasonable jury under either version of events could find those events were caused by the School District's responses to her protected activity.

The School District's explanation that the matter was not sufficiently serious to warrant an expulsion hearing constitutes a legitimate, nondiscriminatory reason for its action (or inaction), and Vereen has not adduced sufficient evidenced to cast doubt on that reason. Summary judgment will be granted in favor of the School District with respect to the retaliation claims concerning the School District's failure to pursue further disciplinary action against this fourth-grade student.

Vereen's remaining retaliation claims concern her performance evaluation for the 2005/2006 school year. Out of eight categories, Vereen received four "A" ratings and four "B" ratings. Under the School District's evaluation criteria, ratings of "A" through "C" constituted satisfactory ratings, whereas ratings of "D" though "F" constituted unsatisfactory ratings. Wilson told Vereen that Vereen's four "B" ratings were attributable to her failure to work on Saturdays to interview teaching candidates, her failure to attend school on Saturdays for students serving suspensions (which the parties describe as "Saturday school for students in lieu of suspension"), and her failure to attend certain community events (including Martin Luther King, Jr., Day festivities at a local church). In her affidavit, Vereen stated that she had always worked on Saturdays when expected to do so. She further states that she had been unavailable to conduct

interviews on Saturdays precisely *because* of her Saturday school responsibilities.  This assertion

is consistent with what she reported to the EEOC in her general intake questionnaire.  App. to

Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Tab T (Docket No.

36-6 at 18).  With respect to the complaint about her failure to attend a church service on Martin

Luther King, Jr., Day, Vereen explained that she had gotten lost while driving to the church, and

that she had informed Wilson of her inability to find the church on that occasion.

     Neither party devotes much discussion to these retaliation claims.  Generally speaking,

the School District argues that Vereen's four "B" ratings did not meet the standard of material

adversity established in *Burlington Northern* (i.e., they would not dissuade a reasonable

employee from pursuing a charge of discrimination against his or her employer).  *Burlington

Northern*, 126 S.Ct. at 2416.  Vereen argues that the ratings were materially adverse, and that the

timing of the ratings were unusually suggestive of a retaliatory animus against her.[15]   This action

was commenced against the School District on April 7, 2006.  Vereen received her allegedly

"materially adverse" performance evaluation on June 16, 2006.

     The United States Court of Appeals for the Third Circuit recently observed that "[w]here

the temporal proximity between the protected activity and the adverse action is 'unusually

suggestive,' it [may] be sufficient standing alone to create an inference of causality and defeat

---

[15]There is an inconsistency between Vereen's brief and her EEOC general intake questionnaire.  In her brief, she appears to indicate that the performance evaluation was completed in January 2006, and that the "B" ratings were in retaliation for her initiation of contact with the EEOC in August 2005.  Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (Docket No. 42) at 11.  In her questionnaire, Vereen states, however, that she received the performance evaluation on June 16, 2006, and that the "B" ratings were, in retaliation for her commencement of the instant action against the School District.  App. to Def.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J., Volume VI, Tab T (Docket No. 36-6 at 18).  This action was commenced on April 7, 2006.  The court concludes that the EEOC questionnaire appears to state the basis for Vereen's retaliation claims, since it would make little sense for the School District to complete an evaluation of a principal for a school year that has not yet concluded.

summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Where such temporal proximity is not unusually suggestive, the court must consider a broader array of evidence to determine whether the proffered evidence, considered as a whole, may raise such an inference. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000). The court does not view the proximity between Vereen's commencement of this action and the School District's completion of the performance evaluation itself to be particularly suggestive of a retaliatory animus, particularly since an evaluation of one's performance throughout the course of a school year would be expected to come at the end of that school year. Evidence that a court may consider in determining whether a retaliation claim can survive a motion for summary judgment may include inconsistencies in the employer's articulated reasons for taking the adverse action against the complaining employee. *LeBoon*, 503 F.3d at 232-33. While the timing of the evaluation may not be unduly suggestive, Vereen appears to argue that the ratings given and the factual bases behind her those ratings (i.e., her failure to attend Saturday school) are sufficient to support her retaliation clams.

Neither party provided evidence concerning the significance of one's receiving a "B" rating as opposed to an "A" rating. The parties agree that both "A" ratings and "B" ratings are considered to be satisfactory. J.C.S. (Docket No. 60) at 13, ¶ 58. In her brief, Vereen makes the conclusory assertion that her ratings go to the core of her career opportunities, but she provides no evidentiary support for this assertion. The School District similarly makes the conclusory statement that a reasonable employee would not have found four "B" ratings (accompanied by four "A" ratings) to be materially adverse. Def.'s Reply to Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. (Docket No. 55) at 12. Whether a "B" rating satisfies the materially adverse

standard depends on the *significance* of such a rating, and the record is devoid of evidence with respect to what effect a "B" rating might have on the career opportunities for a principal such as Vereen.[16]  The School District, however, need not come forward with all of its evidence in order to obtain summary judgment.  It need only show that Vereen cannot establish an element of the claim upon which she would bear the burden of proof at trial.  *DL Resources, Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 224 (3d Cir. 2007).  In the total absence of evidence establishing the impact (or consequences) of Vereen's having been given four "B" ratings (which were considered to be satisfactory), no reasonable jury could find in favor of Vereen on the issue of material adversity.  On the record before the court, the School District is entitled to summary judgment with respect to Vereen's retaliation claims against it.

### *Conclusion*

AND NOW, this 24th day of March, 2008, upon consideration of the motion for summary judgment filed by the School District (Docket No. 33), and the parties' submissions, **IT IS HEREBY ORDERED** that the School District's motion for summary judgment is **GRANTED** with respect to counts I (sex discrimination under Title VII and the PHRA), II (race discrimination) and IV (retaliation claims under Title VII, the PHRA, § 1981 and the Equal Pay

---

[16]It is arguable that tangible employment actions directly affecting one's "compensation, terms, conditions, or privileges of employment" will satisfy the "materially adverse" standard, since those actions threaten the very core of what Title VII was designed to protect.  There is no need for the court to address whether those actions implicate a retaliation claim.  Even if it is assumed that all adverse actions having a tangible effect on one's employment status will automatically satisfy the "materially adverse" standard, Vereen did not adduce evidence that her receipt of four "B" ratings affected her "compensation, terms, conditions, or privileges of employment."  The parties disagree about whether these ratings had an effect on Vereen's salary.  J.C.S. (Docket No. 60) at 14, ¶ 59.  Vereen, however, failed to adduce evidence about the impact (if any) these ratings had on her salary.  Since she would bear the burden of proof at trial regarding the issue of material adversity, her failure to present evidence as to this element of her retaliation claim entitles the School District to summary judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Act) of the amended complaint and **DENIED** with respect to count III (Equal Pay Act) of the

amended complaint.

By the court:


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

cc:    Joseph H. Chivers, Esq.
       Anthony G. Sanchez, Esq.
       Beth S. Mills, Esq.